**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Rhonda Turner, on behalf of herself and all others similarly situated,<br><br>                              Plaintiff,<br><br>      vs.<br><br>Ulster Savings Bank,<br><br>                              Defendant. | Civil Action No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**<u>CLASS ACTION COMPLAINT</u>**

NOW COMES, the Plaintiff Rhonda Turner ("Plaintiff"), on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding herself and on information and belief as to other allegations.

**<u>INTRODUCTION</u>**

1.     This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant, Ulster Savings Bank ("USB"), arising from the unfair and unconscionable assessment and collection of "overdraft fees" ("OD Fees") on accounts that were never actually overdrawn, and for routinely charging two or more fees, including OD Fees and non-sufficient funds fees ("NSF Fees"), on a single item.

2.     These practices breach contractual promises made in USB's adhesion contracts, the "Account Documents".

1

3.      In plain, clear, and simple language, the checking account contract documents discussing OD Fees promise that USB will <u>only</u> charge OD Fees or NSF Fees on transactions where there are insufficient funds to cover them.

4.      As happened to Plaintiff, however, USB charges OD Fees even when there are sufficient funds to cover a debit card or other point of sale ("POS") transaction, in breach of the Account Documents and the duty of good faith and fair dealing.

5.      Moreover, USB unlawfully assesses "Multiple Fees" on a single Automated Clearing House ("ACH") payment.

6.      In USB's sole and undisclosed view, each time USB processes an ACH transaction or check for payment after having been rejected for insufficient funds, it becomes a new, unique item or transaction that is subject to another fee.  But USB's Account Documents never even hint that this counterintuitive result could be possible.

7.      USB's Account Documents indicate that only a single fee will be charged for however many times the request for payment is reprocessed.  An electronic item reprocessed after an initial return for insufficient funds cannot and does not fairly become a new, unique item for fee assessment purposes.

8.      USB breaches its contract, the Account Documents, when it charges more than one fee on the same item, since the contract states—and reasonable consumers understand—that the same item can only incur a single fee.

9.      USB also breaches its duty of good faith and fair dealing when it charges multiple fees on a single transaction.  Specifically, USB abuses its contractual discretion by charging fees upon each reprocessing of the same item.

10. USB's customers have been injured by USB's improper practices to the tune of millions of dollars billed from their accounts in violation of their agreements with USB.

11. On behalf of herself and the "Classes" as defined below, Plaintiff seeks damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

## PARTIES AND JURISDICTION

12. Plaintiff Turner is a natural person who is a citizen of New York and resides in Newburgh, New York. Plaintiff has a personal checking account with USB, which is governed by USB's Account Documents.

13. Defendant Ulster Savings Bank is a bank with its headquarters in Kingston, New York. USB has nearly $1 billion in assets and has branches throughout New York.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because USB is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

15. This Court has original jurisdiction over the action under the Class Action Fairness Act ("CAFA") of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class embers exceed $5 million, exclusive of interests and costs, and at least one member of the proposed class is a citizens of a different state than the Bank.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**I. USB CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT**

16. Plaintiff has a checking account with USB.

17.    USB issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

18.    Pursuant to its Account Documents, USB charges fees for transactions that purportedly result in an overdraft.

19.    Plaintiff Turner brings this cause of action challenging USB's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

20.    Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, USB immediately reduces accountholders' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. Therefore, customers' accounts will always have sufficient available funds to cover these transactions because USB has already sequestered these funds for payment.

21.    However, USB still assesses crippling OD Fees on many of these transactions and mispresents its practices in its Account Documents.

22.    Despite putting aside sufficient available funds for debit card and other POS transactions at the time those transactions are authorized, USB later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

23.    USB maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes

4

a purchase with a debit card, USB sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

24.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

25.     Still, despite keeping those held funds off-limits for other transactions, USB improperly charges OD Fees on those APPSN Transactions, even though the APPSN Transactions *always* have sufficient available funds to be covered.

26.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall

net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

27.    There is no justification for these practices, other than to maximize USB's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance.  But USB is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.  But USB was not content with these millions in OD Fees.  Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

28.    Besides being unfair and unjust, these practices breach contract promises made in USB's adhesion contracts—contracts which fail to inform accountholders about the true nature of USB's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

29.    In plain, clear, and simple language, the Account Documents covering OD Fees promise that USB will only charge OD Fees on transactions that have insufficient funds to cover that transaction.

30.    In short, USB is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**A.**    ***Mechanics of a Debit Card Transaction***

31.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from USB.  When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to USB, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

32.     At this step, if the transaction is approved, USB immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

33.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

34.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

35.     USB (like all credit unions and banks) decides whether to "pay" debit card transactions at authorization. After that, USB is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point—when USB may choose to either pay the transaction or decline it. When the time comes to actually settle

the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity.  *See* Electronic Fund Transfers, 74 Fed.  Reg. 59033-01, 59046 (Nov. 17, 2009).

36.    There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

**B.    USB's Account Contract**

37.    Plaintiff has a USB checking account, which is governed by USB's Account Documents and other relevant agreements.

38.    Amongst the documents governing Plaintiff's relationship with USB is the Account Agreement, attached hereto as Exhibit A, which states in pertinent part:

> It is our policy that if you have insufficient or unavailable funds in your account a presented item will be returned unpaid. However, there may be situations where we, in our sole discretion may permit payment of the item thereby allowing you to overdraw the account. If we return a presented item unpaid, you will be charged *a* returned item fee. ***If we pay the item and permit your overdraft, we will charge you an overdraft item fee***. The treatment of items presented against insufficient or unavailable funds is strictly at our sole discretion.
> . . .
>
> If you request funds at an ATM, or conduct a Point of Sale transaction or make a Ulster Savings Bank debit MasterCard purchase that exceeds your available account balance, ***the Bank may, at its sole discretion, authorize the transaction and you agree to pay the amount of the overdraft plus any overdraft fees as set forth in the Bank's then current Statement of Fees***.

Ex. A at 8, 14 (emphasis added).

39.     For debit card transactions, USB decides whether to "permit" a debit card transaction at the moment of *authorization*.  USB represents to its customers that it is one step, just like consumers using debit cards believe.

40.     Likewise, the Overdraft Disclosure states:

> An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.
> . . .
> We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction
> If we do not authorize and pay an overdraft, your transaction will be declined.

Ex. A at 23.

41.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet USB assesses OD Fees on them anyway.

42.     The above promise means that transactions are only overdraft transactions when they are authorized into a negative account balance.  Of course, that is not true for APPSN Transactions.

43.     APPSN transactions are always *initiated* at the time the customer swipes the debit card when there are sufficient available funds in the account.

44.     In fact, USB actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions.  Instead, it uses a secret posting process described below.

45.     All the above representations and contractual promises are untrue.  In fact, USB charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance.  No express language in any document states that USB may impose OD Fees on any APPSN Transactions.

46.     The Account Documents misconstrue USB's true debit card processing and overdraft practices.

47.     First, and most fundamentally, USB charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions.  That is despite contractual representations that USB will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

48.     USB assesses OD Fees on APPSN Transactions that **_do_** have sufficient funds available to cover them throughout their lifecycle.

49.     USB's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so.  This discrepancy between USB's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

50.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

51.     Because these withdrawals take place upon initiation, they cannot be re-debited later.  But that is what USB does when it re-debits the account during a secret batching posting process.

52.     In reality, USB's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

53.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, USB cannot then charge an

OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

54.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, USB does something new and unexpected, during the middle of the night, during its nightly batch posting process.  Specifically, USB releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

55.     This secret step allows USB to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which USB specifically set aside money to pay.

56.     This discrepancy between USB's actual practices and the contract causes accountholders to incur more OD Fees than they should.

57.     In sum, there is a huge gap between USB's practices as described in the Account Documents and USB's practices in reality.

**C.     *USB Abuses Contractual Discretion***

58.     USB's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous Account Documents.  In addition, USB exploits contractual discretion to the detriment of accountholders when it uses these policies.

59.     Moreover, USB uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

60.     USB uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

**D.**    ***Reasonable Accountholders Understand Debit Card/POS Transactions are Debited Immediately***

61.    The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card/POS transactions.  That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, then they are necessarily applied to the debit card transactions for which they are debited.

62.    USB was and is aware that this is precisely how accountholders reasonably understand such transactions to work.

63.    USB knows that many accountholders prefer debit cards for these very reasons. Research indicates that accountholders prefer debit cards as a budgeting device because they don't allow debt like credit cards do, and because the money comes directly out of a checking account.

64.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, ConsumerAction (Jan. 14, 2019), https://www.consumeraction.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card.

65.    Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, ConsumerAction,

http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited March 11, 2020).

66.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/morepeople-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

67.     Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

68.     USB was aware of accountholder perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

**E.**     ***Plaintiff's Experience***

69.     As an example, on July 31, 2019, Plaintiff was assessed an OD Fee for a POS transaction that settled that day, despite the fact that positive funds were deducted immediately, prior to that day, for the transaction on which Plaintiff was assessed the OD Fee.  At the time that the positive funds were deducted, Plaintiff has a positive balance, which would not have caused an OD Fee.

**II.     USB CHARGES TWO OR MORE FEES ON THE SAME ITEM**

70.     As alleged more fully herein, USB's Account Documents allow it to take certain steps when its accountholders attempt a transaction but does not have sufficient funds to cover it.

13

Specifically, USB may (a) authorize the transaction and charge a *single* OD Fee; or (b) reject the transaction and charge a *single* NSF Fee.

71.    In contrast to its Account Documents, however, USB regularly assesses two or more fees on the *same* item.

72.    This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one fee on the same item when it is reprocessed. Instead, Chase charges one fee even if a transaction is resubmitted for payment multiple times.

73.    USB's Account Documents never disclose this practice. To the contrary, USB's Account Documents indicate it will only charge a single fee on an item or per transaction.

A.    *Plaintiff Turner's Experience*

74.    In support of her claims, Plaintiff Turner offers an example of fees that should not have been assessed against her checking account. As alleged below, USB: (a) reprocessed a previously declined transaction; and (b) charged an additional fee upon reprocessing, for a total assessment of two fees on a single item.

75.    On November 15, 2019, Plaintiff Turner attempted to make a payment in the amount of $309.89 to her insurance company.

76.    USB rejected payment of that transaction due to insufficient funds in Plaintiff's account and charged her a $30 NSF Fee for doing so. Plaintiff does not dispute the initial fee, as it is allowed by USB's Account Documents.

77.    Unbeknownst to Plaintiff and without her request to do so, on November 22, 2019, USB processed the same item yet again, as shown by the fact that it was coded a RETRY PYMT. Again, USB declined the transaction and charged Plaintiff another $30 NSF Fee.

14

78.     In sum, USB assessed Plaintiff $60 in fees to attempt to process a single payment.

79.     Plaintiff understood the payment to be a single item as is laid out in USB's contract, capable at most of receiving a single NSF Fee (if USB returned it) or a single OD Fee (if USB paid it).

**B.      *The Imposition of Multiple Fees on a Single Item Violates USB's Express Promises and Representations***

80.     The Account Documents provide the general terms of Plaintiff's relationship with USB and therein USB makes explicit promises and representations regarding how transactions will be processed, as well as when NSF Fees and OD Fees may be assessed.

81.     The Account Documents contain explicit terms indicating that fees will only be assessed once per check or item when in fact USB regularly charges two or more fees per check or item even though a customer only requested the payment or transfer once.

82.     USB's Account Documents indicate that a singular fee can be assessed on checks, ACH debits, and electronic payments.

83.     Specifically, in the Account Agreement, USB states:

> It is our policy that if you have insufficient or unavailable funds in your account a presented item will be returned unpaid. However, there may be situations where we, in our sole discretion may permit payment of the item thereby allowing you to overdraw the account. **If we return a presented item unpaid, you will be charged *a* returned item fee.** If we pay the item and permit your overdraft, we will charge you an overdraft item fee. The treatment of items presented against insufficient or unavailable funds is strictly at our sole discretion.

Exhibit A at p. 8 (emphasis added).

84.     Likewise, another of the Account Documents, USB's Fee Schedule, attached hereto as Exhibit B, states:

> Returned or Paid Checks (Insufficient Funds/Uncollected Funds includes Electronic Funds Transfer Debits).................................................30.00

15

85.     USB's Account Documents indicate that it will charge a single fee per item that is returned due to insufficient funds.

86.     The same "item" cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

87.     There is zero indication anywhere in the account documents that the same "item" is eligible to incur multiple fees.

88.     Even if USB reprocesses an instruction for payment, it is still the same item.  USB's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

89.     The disclosures described above never discuss a circumstance where USB may assess multiple fees for a single check or ACH transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

90.     In sum, USB promises that one fee will be assessed per electronic payment or check, and these terms must mean all iterations of the same instruction for payment.

91.     As such, USB breached the contract when it charged more than one fee per single item.

92.     Reasonable consumers understand any given authorization for payment to be one, singular "item," as those terms are used in USB's Account Documents.

93.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which USB will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account.  Nowhere does USB

disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject
to additional fees, nor do USB customers ever agree to such fees or practices.

94.    Customers reasonably understand, based on the language of the Account
Documents and USB's other documents, that the bank's reprocessing of checks or ACH payments
are simply additional attempts to complete the original order or instruction for payment, and as
such, will not trigger NSF Fees. In other words, it is always the same item.

95.    Banks and credit unions like USB that employ this abusive practice know how to
plainly and clearly disclose it.  Indeed, other banks and credit unions that do engage in this abusive
practice disclose it expressly to their accountholders—something USB never did.

96.    For example, First Citizens Bank, a major institution in the Carolinas, engages in
the same abusive practice as USB, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we
> may charge you more than one service fee for any given item**. All fees are
> charged during evening posting. When we charge a fee for NSF items, the charge
> reduces the available balance in your account and may put your account into (or
> further into) overdraft.

*Deposit Account Agreement*, First Citizen's Bank (Sept. 2018), https://www.firstcitizens.com/
personal/banking/deposit-agreement (emphasis added).

97.    First Hawaiian Bank engages in the same abusive practices as USB, but at least
currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A
> RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE
> CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND
> RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://www. fhb.com/
en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_
RXP1.pdf (last accessed March 11, 2020) (emphasis added).

98.    Klein Bank similarly states in its online banking agreement:

[W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*Special Handling/Electronic Banking Disclosures of Charges*, First Financial Bank 2 (Aug. 2018), https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure       _of_ Charges.pdf (emphasis added).

99.    Central Pacific Bank, a leading bank in Hawai'i, states in its Fee Schedule under the "MULTIPLE NSF FEES" subsection: "Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds.

100.    BP Credit Union likewise states: "Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item."

101.    Regions Bank likewise states:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. If any item is presented again after having

18

previously been returned unpaid by us, you agree to pay this charge for each time
the item is presented for payment and the balance of available funds in your account
is insufficient to pay the item.

https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf.

102.    Andrews Federal Credit Union states:

You understand and agree that a merchant or other entity may make multiple
attempts to resubmit a returned item for payment. Consequently, because we may
charge a service fee for an NSF item each time it is presented, we may charge you
more than one service fee for any given item. Therefore, multiple fees may be
charged to you as a result of a returned item and resubmission regardless of the
number of times an item is submitted or resubmitted to use for payment, and
regardless of whether we pay the item or return, reverse, or decline to pay the
item. When we charge a fee for NSF items, the charge reduces the available
balance in your account and may put your account into (or further into) overdraft.

https://www.andrewsfcu.org/AndrewsFCU/media/Documents/Terms-and-
Conditions_REBRANDED_Dec2019-Update.pdf

103.    Consumers Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it
is presented, we may charge you more than one service fee for any given item.
Therefore, multiple fees may be charged to you as a result of a returned item and
resubmission regardless of the number of times an item is submitted or
resubmitted to us for payment, and regardless of whether we pay the item or
return, reverse, or decline to pay the item.

https://www.myconsumers.org/docs/default-source/default-document-
library/ccu_membership_booklet_complete.pdf?sfvrsn=6

104.    Wright Patt Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it
is presented, we may charge you more than one service fee for any given item.
Therefore, multiple fees may be charged to you as a result of a returned item and
represented regardless of the number of times an item is presented or represented
to us for payment, and regardless of whether we pay the item or return, reverse, or
decline to pay the item.

https://www.wCUW.coop/en-
us/PDFDocuments/Important%20Account%20Information%20Disclosure%20-%20WCUW.pdf

106.     Railroad & Industrial Federal Credit Union states,


Consequently, because we may charge an NSF fee for an NSF item each time it is
presented, we may charge you more than one NSF fee for any given item.
Therefore, multiple fees may be charged to you as a result of a returned item and
resubmitted to us for payment, and regardless of whether we pay the item or
return, reverse, or decline to pay the item.


https://www.rifcu.org/Documents/Disclosures/Account-Terms-Conditions.aspx

106.     Partners 1st Federal Credit Union states:


Consequently, because we may charge a fee for an NSF item each time it is
presented, we may charge you more than one fee for any given item. Therefore,
multiple fees may be charged to you as a result of a returned item and
resubmission regardless of the number of times an item is submitted or
resubmitted to us for payment, and regardless of whether we pay the item or
return, reverse, or decline to pay the item.


https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf

107.     Members First Credit Union states:


We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time
a transaction is presented if your account does not have sufficient funds to cover
the transaction at the time of presentment and we decline the transaction for that
reason. **This means that a transaction may incur more than one Non-
Sufficient Funds Fee (NSF Fee) if it is presented more than once** . . . we
reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original
presentment and the representment [.]


http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.
pdf

108.     Community Bank, N.A. states,

We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.

https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure.pdf

109.    RBC Bank states,

We may also charge against the Account an NSF fee for each item returned or rejected, including for multiple returns or rejections of the same item.

https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf

110.    Diamond Lakes Credit Union states,

Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item.

https://www.diamondlakesfcu.org/termsconditions.html

111.    Parkside Credit Union states,

If the Credit Union returns the item, you will be assessed an NSF Fee. Note that the Credit Union has no control over how many times an intended payee may resubmit the same check or other item to us for payment. In the event the same check or other item is presented for payment on more than one occasion, your account will be subject to an additional charge on each occasion that the item is presented for payment. There is no limit to the total fees the Credit Union may charge you for overdrawing your account.

https://www.parksidecu.org/_/kcms-doc/1043/44277/Membership-and-Account-Agreement.pdf?__cf_chl_captcha_tk__=add6ebea42df3385074decd4b16c1f86a8369dc9-1580434763-0-AfXmB7FcyYTqzK9oMNbMSKM6k5fnKS5Xf-z7p3Tv-Pt951tDs7wM8yaaIV06w718t2nomyWR1Q8COwgpfgE07FJWZUeFkJN6lxbXDZG1Svid-TWhYm9l85AbCd5afw2imyGdtdzKhXl9bQ9TYkjOlTVM4w8OFJOtE3wVIHrEITn-QnSfoR5-mZxM5O0bu4f_FHoHiJj0XsjNkVoGblk0-lti6-gMnWcu_o87SGQW6dOUF2i6rHGiM_CkdI-ULanKI2NS3KlhkYAuNatN9Jdwr7Plc6oJozMbZ-

QeczuO7VlbRnuCFD0tjzkw1lsnof7uaRvLRAkfKYi3wh0tUU1c_-
Y6N4aH1qN8SPftOn8TYJHO7OoILvpMfamNTqv_djpbUl3GVA

112.    First Financial Bank in Ohio, aware of the commonsense meaning of "item,"

clarifies the meaning of that term to its accountholders:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). Each presentment is considered an item and will be charged accordingly.

https://www.bankatfirst.com/content/dam/first-financial-
bank/eBanking_Disclosure_of_Charges.pdf (last accessed September 18, 2019).

113.    USB provides no such disclosure, and in so doing, deceives its accountholders.

**C.**    ***The Imposition of Multiple Fees on a Single Transaction Breaches USB's Duty of Good Faith and Fair Dealing***

114.    Parties to a contract are required not only to adhere to the express conditions in the

contract, but also to act in good faith when they are invested with a discretionary power over the

other party.  This creates an implied promise to act in accordance with the parties' reasonable

expectations and means that USB is prohibited from exercising its discretion to enrich itself and

gouge its customers.  Indeed, USB has a duty to honor transaction requests in a way that is fair to

Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever

greater penalties on the depositor.

115.    Here—in the adhesion agreements USB foisted on Plaintiff and its other

customers—USB has provided itself numerous discretionary powers affecting customers' credit

union accounts.  But instead of exercising that discretion in good faith and consistent with

consumers' reasonable expectations, USB abuses that discretion to take money out of consumers'

account without their permission and contrary to their reasonable expectations that they will not

be charged multiple fees for the same transaction.

116.    USB abuses the power it has over customers and their credit union accounts and acts contrary to reasonable expectations under the Account Documents when it construes the word "item" to mean each iteration of the same payment.  This is a breach of USB's implied covenant to engage in fair dealing and to act in good faith.

117.    Further, USB maintains complete discretion not to assess fees on transactions at all.  By exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging more than one fee on a single item, USB breaches the reasonable expectation of Plaintiff and other customers and in doing so violates the implied covenant to act in good faith.

118.    It was bad faith and totally outside Plaintiff's reasonable expectations for USB to use its discretion to assess two or more fees for a single attempted payment.

119.    When USB charges multiple fees, USB uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer expectations. USB uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

## **CLASS ALLEGATIONS**

120.    Plaintiff brings this action on behalf of herself and on behalf of all others similarly situated pursuant to Rule 23. The Classes include:

> All consumers who, within the applicable statute of limitations period, were charged OD Fees on APPSN Transactions on a USB checking account (the "OD Fees Class").

> All consumers who, within the applicable statute of limitations period, were charged Multiple Fees for the same item in a USB checking account (the "Multiple Fee Class").

121.    Excluded from the Classes are USB, USB's subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

122.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or to add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

123.    The parties are numerous such that joinder is impracticable.  Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resorting to USB's records.  USB has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiff.

124.    The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual class members because USB has acted on grounds generally applicable to the class.  Such common legal or factual questions include, but are not limited to:

a)    Whether USB improperly charged OD Fees on APPSN Transactions;

b)    Whether USB improperly charged Multiple Fees on the same transactions;

c)    Whether the conduct enumerated above violates the contract;

d)    Whether the conduct enumerated above violates the covenant of good faith and fair dealing; and

24

e)      The appropriate measure of damages.

125.    Plaintiff's claims are typical of the claims of the other members of the Classes in that they arise out of the same wrongful business practices by USB, as described herein.

126.    Plaintiff is a more than an adequate representative of the Classes in that Plaintiff has an USB checking accounts and have suffered damages as a result of USB's contract violations. In addition:

a)      Plaintiff is committed to the vigorous prosecution of this action on behalf of itself and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of accountholders against financial institutions.

b)      There is no conflict of interest between Plaintiff and the unnamed members of the Classes.

c)      Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d)      Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

127.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

128.    Plaintiff and the members of the Classes suffered, and will continue to suffer, harm as a result of DCFU's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Classes is impractical.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by DCFU's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum.  The

conduct of this action as a class action conserves the resources of the parties and of the judicial

system and protects the rights of the members of the Classes.

129.    USB has acted or refused to act on grounds generally applicable to the class,

thereby making appropriate corresponding declaratory relief with respect to the Classes as a whole.

130.    All conditions precedent to bringing this action have been satisfied and/or waived.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract, Including the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Classes)**

131.    Plaintiff incorporates by reference the preceding paragraphs.

132.    Plaintiff and USB have contracted for credit union services, as embodied in USB's

Account Documents and related documentation.

133.    All contracts entered by Plaintiff and the Classes are identical or substantively

identical because USB's form contracts were used uniformly.

134.    USB has breached the express terms of its own agreements as described herein

when it assessed multiple fees on the same item.

135.    Under the law of the state of New York, good faith is an element of every contract.

All contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair

dealing, in connection with executing contracts and discharging performance and other duties

according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put

differently, the parties to a contract are mutually obligated to comply with the substance of their

contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify

terms constitute examples of bad faith in the performance of contracts.

136.    Subterfuge and evasion violate the obligation of good faith in performance even

when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of

inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of

the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

137.    USB abused the discretion it granted to itself when it assessed OD Fees on accounts that were not actually overdrawn and charged multiple fees on the same item.

138.    In these and other ways USB violated good faith and fair dealing.

139.    USB willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing revenue from Plaintiff and other members of the Class.

140.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contracts.

141.    Plaintiff and members of the Classes have sustained damages as a result of USB's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

142.    Plaintiff and members of the Classes have no adequate remedy at law.

**SECOND CLAIM FOR RELIEF**
**Violation of New York General Business Law, N.Y. Gen. Bus. Law § 349 *et seq*.**
**(On Behalf of the Plaintiff and the Classes)**

143.    Plaintiff incorporates by reference the preceding paragraphs.

144.    This claim is asserted on behalf of Plaintiff and the classes under Article 22-A of the New York General Business Law, the Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law §§ 349 *et seq*., which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349(a).

145.    USB's policies and practices complained of herein were and are consumer-oriented, in that they affect all consumers who maintain checking accounts with USB.

146.    The complained-of policies and practices were and are misleading in a material respect, because USB promised to charge OD Fees only on transactions that overdraw an account, when in fact USB assesses overdraft fees even when there is enough money in the account to pay for the transaction at issue. Further USB promised to only charge one fee per item but in fact charged multiple fees per item.

147.    Had Plaintiff and the members of the New York Subclass known they could be charged OD fees on transactions that did not overdraw their account, or could be charged multiple fees per item, they would have made different payment decisions so as to avoid incurring such fees and/or would have banked elsewhere.

148.    Plaintiff and members of classes were injured as a result of USB's policies and practices, in that their accounts were debited by USB in violation of their agreements with the bank.

149.    USB's actions were willful and knowing.

150.    As redress for USB's repeated and ongoing violations of these consumer protection statutes, Plaintiff and members of the classes are each entitled to actual damages, treble damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

**THIRD CLAIM FOR RELIEF**
**Violation of Electronic Fund Transfers Act (Regulation E)**
**C.F.R. § 1005 et seq. (authority derived from 15 U.S.C. § 1693 *et seq*.))**
**(On Behalf of Plaintiff and the OD Fee Class)**

151.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

152.    By charging overdraft fees on ATM and nonrecurring transactions, Defendant violated Regulation E (12 C.F.R. §§1005 et seq.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

153.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p ]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. (Id.) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(l).) To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

154.    The intent and purpose of this Opt-In Contract is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably

irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

155.    Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when you do "not have enough money in your account to cover a transaction, but we pay it anyways" when in fact Defendant assesses overdraft fees when there is enough money in the account to pay for the transaction at issue.

156.    As exhibited by the transactions above, Plaintiff's account had funds to cover the transactions yet Defendant charged overdraft fees.

157.    As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so, Defendant has harmed Plaintiff and the Class.

158.    Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

a        Certification for this matter to proceed as a class action on behalf of the Classes;

b        Declaring USB's OD Fee and multiple NSF Fees policies and practices to be in

breach of its contract with accountholders;

c       Restitution of all OD Fees and multiple NSF Fees paid to USB by Plaintiff and the members of the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

d       Actual damages in an amount according to proof;

e       Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

f       For costs and attorneys' fees under the common fund doctrine, and all other applicable law; and

g       Such other relief as this Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**

Dated: August 4, 2020

Respectfully submitted,

/s/ Andrew Shamis
**SHAMIS & GENTILE, P.A.**
Andrew Shamis, Esq.
NY Bar No. 5195185
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

Jeffrey D. Kaliel (pro hac vice to be filed)
Sophia G. Gold (pro hac vice to be filed)
**KALIEL PLLC**
1875 Georgia Ave. NW 10th Floor
Washington, D.C.  20009
Telephone: (202) 350-4783
*jkaliel@kalielpllc.com*
*sgold@kalielplllc.com*

Scott Edelsberg (pro hac vice to be filed)
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Office: (305) 975-3320
scott@edelsberglaw.com

***Counsel for Plaintiff and the Proposed Class***